Mr. Justice Davis
delivered the opinion of the court:
The Union Pacific Railroad Company, conceding the right of the Government to retain one-half of the compensation due it for *41 the transportation of the mails, military and Indian supplies, and apply the same to re-imburse the Government for interest paid by it on bonds issued to the corporation to aid in the construction of its railroad and telegraph lines, seeks to establish by this suit its right to the other moiety. The United States, on the other hand, having paid interest on these bonds in excess of the sums credited to the company for services rendered by it, insists upon its right to withhold payment altogether. One of the grounds on which this right of retention is sought to be maintained is by reason of the general right of set-off. It is true this right, as a general proposition, exists in the Government, and is commonly exercised by,it when settling with those having claims against it. But, manifestly, the rules applicable to ordinary claimants for services rendered the United States do not apply to this controversy. The bonds in question were issued by the United States, in pursuance of a scheme to aid in the construction of a great national highway; in themselves they do not import any obligation on the part of the corporation to pay, and whether, when the United States have paid interest on them, an obligation arises on the part of the corporation to refund it, depends wholly on the conditions on which the bonds were delivered to the corporation and received by it. These conditions are embodied in the legislation of Congress on the subject; and if, on a fair interpretation of this legislation, the corporation is found to be now a debtor to the United States, the deduction for interest paid on the bonds can be lawfully made. But if the converse of this proposition is ascertained to be true, the Government cannot rightfully withhold from the corporation one-half of its earnings.
In construing an act of Congress we are not at liberty to recur to the views of individual'members in debate, nor to consider the motives which influenced them to vote for or against its passage. The act itself speaks the will of Congress, and this is to be ascertained from the language used. But courts may with propriety, in construing a statute, recur to the history of the times when it was passed, and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it. (Aldridge v. Williams, 3 How., p. 24; Preston v. Browder, 1 Wheat., 120.)
Many of the provisions in the original act of 1862 are outside of the usual course of legislative action concerning grants to *42 railroads, and cannot be properly construed without reference to the circumstances which surrounded Congress when the act was passed. The war of the rebellion was in progress, and the country had become alarmed for the safety of the Pacific States owing to complications with England. In case these complications resulted in an open rupture, the loss of our Pacific possessions was feared $ but, even if this fear were groundless, it was quite apparent that we were unable to.furnish that degree of protection to the people occupying them which every government owes its citizens. It is true the threatened danger was happily averted, but wisdom pointed out the necessity of making suitable provision for the future. This could be done in no better way than by the construction of a railroad across the continent.
Such a road would bind together the widely-separated parts of our common country, and furnish a cheap and expeditious mode for the transportation of troops and supplies. And if it did nothing more than afford the required protection to the Pacific States, it was felt that the Government, in the execution of a plain duty, could not justly withhold the aid necessary to build it. And so strong and pervading was this opinion, that it is by ■no means certain the people would not have sanctioned the ¡action of Congress if it had departed from the traditional policy of the country regarding works of internal improvements, .and charged the Government itself with the direct execution of the enterprise.
This enterprise was viewed as a national undertaking for national purposes, and the public mind was directed to the end to be accomplished rather than the particular means employed for the purpose. Although this road was a military necessity, there were other reasons active at the time in producing an opinion for its completion besides the protection of an exposed frontier. There was a vast unpeopled territory lying between the Missouri and Sacramento Eivers, which was practically worthless without the facilities afforded by a railroad for the transportation of person and property. With its construction the agricultural and mineral resources of this territory could be developed, settlements made where settlements were possible, and thereby the wealth and power of the United States ■essentially increased. And there was also the pressing want, in times of peace even, of an improved and cheaper method for *43 tbe transportation of tbe mails and supplies for tbe Army and tbe Indians.
It was in tbe presence of these facts that Congress undertook to deal with tbe subject of this railroad. Tbe difficulties in tbe way of building it were great, and by many intelligent persons considered insurmountable.
Although a free people, when resolved upon a course of action, can accomplish great results, tbe scheme for building a railroad 2,000 miles in length, over deserts, across mountains, and through a country inhabited by Indians jealous of intrusion upon their rights, was universally esteemed at the time to be a bold and hazardous undertaking. It is nothing to the purpose that the difficulties in the way of the undertaking, after trial, in a great measure disappeared, and that the road was constructed at less cost of time and money than was considered possible. No argument can be drawn from the wisdom that comes after the fact. Congress acted with reference to a state of things supposed to exist at the time, and no aid can be derived, in the interpretation of its legislation, from the consideration that the theory on which it proceeded turned out not to be correct. The project of building the road was not conceived for private ends, and the prevalent opinion was that it could not be worked out by private capital alone. It was a national work, originating in national necessities, and requiring national assistance.
The policy of the country, to say nothing of the supposed want of power, stood in the way of the United States taking the work into its own hands. Even if this were not so, reasons of economy suggested that it were better to enlist private capital and individual enterprise in the project. This Congress undertook to do, and the inducements held out were such as it was believed would procure the requisite capital and enterprise. But the purpose in presenting these inducements was to promote the construction and operation of a work deemed essential to the security of great public interests.
It is true the scheme contemplated profit to individuals, for without reasonable expectation of this, capital could not be obtained, nor the requisite skill and enterprise; but this consideration does not in itself change the relation of the parties to this suit. This might have been so if the Government had incorporated a company to advance private interests, and agreed to aid it on account of supposed incidental advantages which would *44 accrue to the public from the completion of the enterprise. But the Government proceeded on a wholly different theory. It promoted the enterprise to advance its own interests, and endeavored to enlist private capital and individual enterprise as a means to an end — the securing a road which could be used for governmental purposes. Whatever obligations, therefore, rest on the company incorporated to accomplish this purpose, must depend on the true meaning of the enactment itself, viewed in the light of cotemporaneous history.
It has been observed by this court that the title of an act, especially in congressional legislation, furnishes little aid in the construction of it, because the body of the act, in so many cases, has no reference to the matter specified in the title. (Hadden v. The Collector, 5 Wall., p. 110.) This is true, and we have no disposition to depart from this rule, but the title, even, of the original act of 1862, incorporating the defendant, (12 Stats., p. 489,) seems to have been the subject of special consideration by Congress, for it truly discloses the general purpose Congress had in view in passing it. It is “An act to aid in the construction of a railroad from the Missouri River to the Pacific Ocean, and to secure to the Government the use of the same for 'postal, military, and other purposesThat there should, however, be no doubt of the national character of the work which Congress proposed to aid, the body of the act contains these words: “And the better to accomplish the object of this act, namely, to promote the public interest and welfare by the construction of said railroad and telegraph lines, and keeping the same in working order, and to secure to the Government at all times (but particularly in time of war) the use and benefits of the same for postal, military, and other purposes, Congress may at any time, having due regard for the rights of said companies named therein, add to, alter, amend, or repeal this act.” (See eighteenth section of charter, 12 Stat. L., p. 497.) Indeed, the whole act contains unmistakable evidence that if Congress was put to the necessity of accomplishing a great public enterprise through the instrumentality of private corporations, it took care that there should be no misunderstanding about the objects to be accomplished or the motives which influenced its course of action.
If it had been equally explicit in the provision regarding the bonds to be issued in aid of the road, there would have *45 been no occasion for this suit. But even in this particular, looking to the motives which led to the act and the objects intended to be effected by it, we do not think'there is any serious difficulty to get at the true meaning of Congress. The act itself was an experiment, and must be considered in the nature of a proposal to enterprising men to engage in the work, for there was no certainty that capital, with the untried obstacles in the way, could be enlisted. If enlisted at all, it could only be on conditions which would insure, in case of success, remuneration proportionate to the risk incurred.
The proffered aid was in lands and interest-bearing bonds of the United States. There is no controversy about the terms on which the lands were granted, and the only point with which we have to deal relates to the nature and extent of the obligation imposed by Congress on the company to pay these bonds. It is not doubted that the Government was to be re-imbursed both principal and interest, but the precise question for decision is, whether the company was required to pay the interest before the maturity of the principal.
The solution of this question depends upon the meaning of the fifth and sixth sections of the original act of 1862, and the fifth section of the amendatory act of 1864. (12 Stat. L:, 492; 13 Stat. L., 359.) The fifth section of the original act contains the undertaking of the Government, and the sixth defines the obligation of the company. By the fifth it is provided that, on the completion of the road in sections of forty miles, there shall be issued and delivered to the company a certain number of interest-bearing bonds of the United States, payable thirty years after date, with interest payable semi-annually. And “ to secure the repayment to the United States, as ‘hereafter provided,’ of the amount of said bonds, together with all interest thereon which shall have been paid by the United States,” it was further provided that the issue and delivery of the bonds should constitute a first mortgage on the property of the company, with a right reserved to the Government to declare a forfeiture and take possession of the road and telegraph-line in case “of the refusal or failure of the company to redeem said bonds, or any part of them, when requested to do so by the Secretary of the Treasury, in accordance with the provisions of the act.” The manifest purpose of this section is to take a lien on the property of the corporation for the ultimate redemption of the bonds, *46 principal and interest, but the manner of redemption and time of it are left for further provision.
That the Government was expected in the first instance to pay the interest is clear enough, for the mortgage was taken to secure the repayment of the bonds, “together with all interest thereon which shall have been paid by the United States.’7 This phrase implies a prior payment by the United States, whatever may be the duty of the corporation in regard to reimbursement, as subsequently defined. Besides this, when repayment is spoken of, it is understood that something has been advanced which is to be paid back. Apart from this, had it been the intention that the corporation itself should pay the interest as it fell due, phraseology appropriate to such a purpose would have been used. But when and how the re-im-bursement was to be made was declared to be “as hereinafter provided,’7 that is, in conformity with the terms prescribed in another portion of the act. And that this is so is evident enough from the latter part of. the section, which directs the Secretary of the Treasury to enforce the forfeiture and take possession of the road on failure of the corporation to redeem said bonds, or any part of them, (referring to the different periods of their issue,) according to the plan of redemption thus provided, or,in other words, “in accordance with the provisions of this act.” The obligations imposed on the corporation, or assumed by them, in relation to the repayment of the bonds, are set forth entire in the next, or sixth, section, which, on account of its importance, is set forth at length :
“ Seo. 6. And be it further enacted, That the grants aforesaid are made upon condition that said company shall pay said bonds at maturity, and shall keep said railroad and telegraph-line in repair and use, and shall at all times transmit dispatches over said telegraph-line, and transport mails, troops, and munitions of war, supplies, and public stores ux>on said railroad for the Government whenever required to do so by any Department thereof; and that the Government shall at all times have the preference in the use of the same for all the purposes aforesaid (at fair and reasonable rates of compensation, not to exceed the amounts paid by private parties for the same kind of service;) and all compensations for services rendered for the Government shall be applied to the payment off said bonds and interest until the whole amount is fully paid. Said company may also pay the *47 United States, wholly or in part, in the same or other bonds, Treasury notes, or other evidences of debt against the United States, to be allowed at par, and after said road is completed, until said bonds and interest are paid, at least 5 per centum of the net earnings of said road shall also be annually applied to the payment thereof.”
Leaving out of consideration the parts of this section not pertinent to the present inquiry, there are three things, and three only, which the corporation is- required to do concerning the bonds in controversy. 1st. To pay said bonds at maturity. 2d. To allow the Government to retain the compensation due the corporation for services rendered, and apply the same to the payment of the bonds and interest until the whole amount is fully paid. 3d. To pay over to the Government, after the road shall have been fully completed, 5 per cent, of the net earniggs of the road, to be appropriated to the payment of the bonds and interest.
If we take the language used in its natural and obvious sense, there can be no difficulty in ariving at the meaning of the condition “ to pay said bonds at maturity,” which was imposed upon this corporation. As commonly understood, the word “ maturity,” in its application to bonds and other similar instruments, refers to the time fixed for their payment, which is the termination of the period they have to run. The bonds in question were bonds of the United States, promising to pay to the holder of them 81,000 thirty years after date, and the interest every six months. This obligation the Government was required to perform, and, as the bonds were issued and delivered to the corporation to be sold for the purpose of raising money to construct its road, it is insisted that Congress must have meant to impose a corresponding obligation on the corporation. In support of this construction it is sought to give to the word “ maturity” a double signification, applying it to each payment of interest as it falls due as well as to the principal. But this is extending the operation of words by a forced construction beyond their natural and ordinary meaning, which is contrary to all legal rules. Courts cannot supply .omissions in legislation, nor afford relief because they are supposed to exist. “ We are bound,” said Justice Buffer in an early case in the king's bench, “ to take the act of Parliament as they have made it; a casus omiss%is can in no case be supplied by a court of law, for *48 that would be to make laws; nor can I conceive that it is our province to consider whether such a law that has been passed be tyrannical or hot.” (Jones v. Smart, 1 Term Reports, 44-52.)
Lord Chief Baron Eyre, in the case of Gibson v. Minet, (1 H. Bl., 5G9-614,) said: “ I venture to lay it down as a general rule respecting the interpretation of deeds, that all latitude of construction must submit to this restriction, namely, that the words may bear the sense which by construction is put upon them. If we step beyond this line we no longer construe men’s deeds, but make deeds for them.” This rule is as applicable to the language of a statute as to the language of a deed. The words “to pay said bonds at maturity ” do not bear the sense which is sought to be attributed to them. They imply, obviously, an obligation to pay both principal and interest when the time fixed for the payment of the principal has passed; but they do not imply an obligation to pay the interest as it accrues and the principal when due. It is one thing to be required to pay principal and interest when the bonds have reached maturity, and a wholly different thing to be required to pay the interest every six months and the principal at the end of thirty years. The obligations are so different, that they cannot both grow out of the direct words employed, and it is necessary to superadd other words in order to extend the condition so as to include the payment of semi-annual interest as it falls due. Neithef on principle nor authority is such a plain departure from the express letter of the statute warranted. And especially is this so when the construction leads to so great an extension of a condition to defeat a grant.
The failure to perform the condition is cause of forfeiture. If the natural meaning of the words be adopted as the true meaning, there can be no forfeiture until the bonds themselves have matured. On the contrary, if the construction contended for be allowed, the grants made to the corporation are subject to forfeiture on each occasion that six months’ interest falls due and is not met. It would require a pretty large inference to draw from the language used authority to enlarge in a particular so essential the terms of a condition assumed by the corporation when it assented to the act. Besides this, when Congress imposed this condition it well knew that the undertaking of the Government bound it to pay, to the holder of any bond, interest every six months and the principal at the time the bond *49 matured. With this knowledge, dealing’ as it did with the relations the company were to bear to the Government on the receipt of these bonds, had it intended to exact of the company the payment of interest before the maturity of the bonds, it would have declared its purpose in language about which there could be no misunderstanding. But, if the words “ to pay said bonds at maturity ” do not give notice that this exaction was intended, neither do the other provisions of the sixth section. They created no obligation to keep down the interest, nor were they so intended. The proposition to retain the amount due the company for services rendered, and apply it toward the general indebtedness of the company to the Government, cannot be construed into a requirement that the company shall pay the interest from time to time and the principal when due. It was in the discretion of Congress to make this requirement, and then, as collateral to it, provide a special fund or funds out of which the principal obligation could be discharged. .This Congress did not choose to do, but rested satisfied with the entire property of the company as security for the ultimate payment of the principal and interest of the bonds delivered to it, and, in the mean time, with special provisions looking to the re-im-bursement of the Government for interest paid by it, and the application of the surplus, if any remained, to discharge the principal. The company, for obvious reasons, might be very willing to accept the bonds of the Government on these terms, and very unwilling to come under an absolute promise to pay the current interest as it accrued. If it were in a condition, either during the progress of the work or on its completion, to earn anything, there was no hardship in the proposed application of the compensation due it, but, it can be readily seen, if the company were required to raise money every six months to pay interest, when all its available means were necessary to the prosecution of the work, the burden might be very heavy. Congress did not see fit to impose this burden, and place the company in a position to risk the forfeiture of all its grants in case of failure to provide the means to pay current interest. Besides, it is fair to infer that Congress supposed that the services to be rendered by the road to the Government would equal the interest to be paid; and that this was not an unreasonable expectation, the published statistics of the vast cost of transporting *50 military and naval stores and tbe mails to the Pacific coast, by the ancient methods, abundantly show.
The views presented regarding the provision that the Government shall retain the compensation for services rendered by the company, either before or after the road is completed, are equally applicable to the provision that after the road is completed, 5 per cent, of the net earnings of the road shall be annually applied to the payment of bonds and interest. It is not perceived how, on any principle of construction, an obligation of the corporation to pay the interest on the bonds every six months after they shall have been issued can be predicated •on the terms of this provision, any more than on the terms of the other. Both are reserved funds out of which the Government was to be re-imbursed in the first instance the interest it had paid, leaving the surplus, if any, to be applied to the payment of the principal of the bonds.
In addition to all that has been said, there is enough in the scheme of the act and the purposes contemplated by it to show that Congress never intended to impose on the corporation the obligation to pay current interest. The act was passed in the midst of war, as has been stated, when the means for national defense were deemed inadequate to the wants of the country, and the public mind was alive to the necessity of uniting by iron bands the destiny of the Pacific States with those of the Atlantic. Confessedly the undertaking was outside of the ability of private capital to accomplish, and only by the helping-hand of Congress could the problem, difficult of solution under the most favorable circumstances, be worked out. Local business, as a source of profit, could nof be expected while the road was in course of construction, on account of the character of the country it traversed, and whether, when completed, as an investment it would prove valuable, was a question for time to determine. But vast as the work was, limited as were the private resources to build it, the growing wants of the country, as well as the existing and future military necessities of the Government, demanded that it be completed. Under the stimulus of these considerations Congress acted. It did not act for the benefit of private persons, nor in their interest, but for an object deemed essential to the security of the country, as well as to the prosperity of the country.
Compelled as it was to incorporate a private company to ac- *51 eomplish its object, it proffered tbe terms on which it would lend its aid, which, if deemed too liberal now, were then considered, with the lights before it, not more than sufficient to engage the attention of enterprising men, who, if not themselves capitalists, were in a position to command the use of capital. These terms looked to ultimate security rather than immediate re-imbursement, and for the obvious reason that the corporation would require all its available means in construction, and to exact from it, while the work was in progress, the obligation to keep down the interest on the bonds of the United States, would tend to cripple the enterprise at a time when the primary object with Congress was to advance it. There could, however, be no reasonable objection to the application “of all compensations for services rendered for the Government” from the outset, and “ 5 per cent, of the net earnings after the completion of the road ” to the payment of the bonds and interest, and these exactions were accordingly made.
Of necessity there were risks to be taken in aiding with money or bonds an enterprise unparalleled in the history of any free people, which, if completed at all, would require, as was supposed, twelve years in which to do it. But these risks were common to both parties, and Congress was obliged to assume its share and advance the bonds or abandon the enterprise, for obviously the grant of lands, however valuable after the road was built, could not be available as a resource with which to build it.
If the road were a success, in addition to the benefit it would be to the United States, the corporation would be in a situation to repay advances for interest, and pay the principal when due. If, on the contrary, the investment proved to be a failure, subjecting the private persons who embarked their capital in it to a total loss, there was left for the Government the entire property of the corporation, of which immediate possession could bo taken on a declaration of forfeiture.
In view of the circumstances under which the act of 1882 was passed, and the purposes to be accomplished by it, appearing as they do in the title as well as the body of the act, and constituting as they do the public history of this legislation, this brief summary presents, as we think, fairly its scope and effect, which are inconsistent with the position asserted by the appellant.
*52 Notwithstanding the favorable terms proposed by Congress, the road languished, and the effect of this was the amendatory act of 1864. By this the grant of lands was doubled, a second in lieu of first mortgage accepted by the Government, and a provision inserted that u only one-half of the compensation for services rendered for the Government by said companies (meaning this and the auxiliary companies incorporated at the same time) shall be required to be applied to the payment of the bonds issued by the Government in aid of the construction of said road.”
This amendment was, without doubt, intended merely to modify the provision in the original act so as to allow the Government to retain only one-half of the compensation for services rendered, instead of all. Although the requirement in this provision is that the compensation shall be applied to u the payment of the bonds,” and in the former “ to pay the bonds and interest,” yet it cannot be supposed Congress intended to relinquish the right secured in the former act to make the application in the first place to the interest and then to the principal. The purpose of Congress could have been nothing more than to surrender on behalf of the Government the right to retain the whole of the companies’ earnings, and to accept in lieu of it the right to retain the half, leaving unaffected by this change any right touching this subject secured in the former act. The change was a very material one, and intended, doubtless, as a substantial-favor to the companies, but on the principle contended for it would prove, instead of this, to be of no value. Of what possible advantage could it be to these companies to receive apyment for one-half their earnings, if they were subject to to a suit to recover it back as soon as it was paid % And this is the effect of the provision on the theory that the companies are debtors to the Government on every semi-annual payment of interest. They could not, in the nature of things, have accepted the stipulation with an understanding that any such effect would be given it. If the Government consents to the diminution of its security, so that only half of the pr'ices due for services are to be applied to the payment of the interest or principal, what is to become of the other half? Surely there is no implication that the Government shall retain it, and, if not, who is to get it? Manifestly, the companies who have earned the money.
*53 It is very clear that tbe Congress of 1864 did not supjmse, in making this concession, that it would be barren of results, but as the rights of the parties have been settled by the construction given to the original provision on this subject, it is unnecessary to pursue the subject further.
The practice of the Government for a series of years was in conformity with the views we have taken of the effect of the charter, until the Secretary of the Treasury arrested the payment of the money earned by the companies for services rendered the Government, and directed that it be withheld. This action of the Secretary brought the subject to the attention of Congress, and the Act 3d March, 1871, (16 Stat. L., p. 525, § 9,) was passed, directing that one-half of the money due the Pacific Railroad Companies for services rendered, either “heretofore or hereafter,” be paid them, leaving open the question of ultimate right for legal decision.
After this, another act was passed on this subject, by virtue of which this suit was instituted by the appellee in the Court of Claims, (Act 3d March, 1873, §2,17 Stat. L., p. 508.) It is contended that the purpose of this act is to repeal that portion of the charter of the Union Pacific Company containing the provision we have discussed. But, manifestly, the purpose was very different. It is true, the act directs the Secretary of the Treasury to withhold all payments to the Pacific Companies on account of freights and transportation, but at the same time it authorizes any company thus affected to bring suit in the Court of Claims for “ such freight and transportation,” and in such suit “the right of such company to recover the same upon the law and the facts shall be determined, and also the rights of the United States upon the merits of all the points presented by it in answer thereto by them.” This means nothing more nor less than the remission to the judicial tribunals of the country of the question whether this company, and others similarly situated, had the right to recover from the Government one-half of what it earned by transportation, which question was to be determined upon its merits.
The merits of such a question are determined when the effect of the charter is determined. It is hardly necessary to say that it would have been idle to authorize a suit to be brought, if it were the intention to repeal the provision on which the suit could alone be predicated.
*54 We cannot go into an argument on the consequences which follow our decision. Consequences are not an element to be considered in the determination of the question whether an act of incorporation is less beneficial to the Government than it supposed. And whether an act of Congress be more or less politic and wise it is not our province to determine. When we-have declared the meaning of it, if there be power to pass it, our duty in connection with it is ended.
The judgment of the Court of Claims is affirmed.