Eott, J.,
delivered the opinion of the court:
This is an action brought by the Denver Pacific Eailway to recover for services rendered in carrying the defendants’ mails •from Denver to Cheyenne. The defendants have demurred to the petition, but it is conceded by their counsel, the Assistant Attorney-General, that the claimants are entitled to recover a portion of their demand, and hence that the demurrer must be overruled. The resulting question, elaborately argued on the hearing, is as to the amount for which judgment should be entered, it being mutually conceded that the petition presents fairly the law and the facts involved in the ease.
The position which the defendants occupied on the argument, briefly stated, is this: (1.) That no privity of contract exists between them and the claimants. (2.) That the claimants are nothing more than the assignees or successors pro hac vice of the Kansas Pacific Eailroad. (3.) That the Government ma,y withhold one-half of the freight-moneys earned by the claimants in carrying the mails, as if the service had been performed by their assignors, the Kansas Pacific Eailroad, and may apply the .money thus withheld to the payment of the bonds issued in aid *255 of the construction of that roach (See the Pacific Railroad Acts 1862, 1864, 12 Stat. L., 489, §§ 5, 6, 9; 13 Stat. L., 356, § 5.)
It was determined by the decision of the Supreme Court in the Union Pacific Railroad Case (11 C. Cls. R., 1) that this half of the earnings of these roads, which the Government is authorized to withhold, is not a condition attached to the franchise, nor yet an obligation springing out of the land-grants conferred upon the companies, but simply a specific mode of payment upon the mortgage which the Pacific Railroad Act, 1862, (12 Stat. L., 489, §§ 5, 6,) created. In the work of construing the uncertain statutes brought before us by this suit, that much may be taken as settled. Whatever words of obligation they contain referring to the subject-matter of this controversy must be taken as restricted to the subject-matter of the statutory mortgage. The vital question, and, indeed, the only question now to be determined, is, whether the property of the Denver Pacific Bail way was acquired and taken subject to the incum-brance or mortgage which rests upon the Kansas Pacific road. That inquiry involves a. brief review of the statutory history of both roads.
The Pacific Railroad Act, 1862, (12 Stat. L., 489, §§ 5, 9,) authorized a loan of Government bonds to the Kansas Pacific Bail-road, (then known as the Leavenworth, Pawnee and Western Bailroad Company,) and at the same time imposed upon the •road as security for such advances a statutory mortgage. The loan authorized by the act was not of an amount in gross, but was to be dependent upon the length of the road, the advances being limited to $16,000 a mile, and made as sections of twenty miles were completed. (Amendatory Act, 1864,13 Stat. L., 356, § 10.) It was therefore essential to the security of the Government that some limitation be set upon the length of the route; and accordingly it was provided that the projected railway, starting from an eastern terminus at the mouth of the Kansas Biver, should end by connecting with the Union Pacific Bail-road at the one hundredth meridian. The act contemplated, on the one hand, that every mile of this road should be aided by the loan, and provided, on the other, that the delivery of the bonds to the company should “ ipso facto constitute a first mortgage on the whole line of- the railroad and telegraph, together with the rolling-stock, fixtures, and property of every kind and description, and in consideration of which said bonds may be issued.” (Act 1862, 12 Stat. L., 489, § 5.)
*256 But before the work of constructioa begau it was discovered that the point where the one hundredth meridian would intersect the Union Pacific Eailroad would not form a desirable junction for the branch roads that were to diverge from the main or trunk line. Accordingly, by a general provision in the Amendment Act, 1864, (13 Stat. L., 356, § 9,) these companies were authorized to connect their roads with the Union Pacific “at any point westwardly of such initial point,” the loan, nevertheless, being restricted to the same amount which the roads would have been entitled to receive in bonds if they had connected at the one hundredth meridian. And by the Amendment Act, 1866, (14 Stat. L., 79, § 1,) a similar provision was enacted, which specially authorized the Kansas Pacific Eailroad (then known as the Union Pacific Eailroad, eastern division) to extend their line to a point of junction not “more than fifty miles westwardly from the meridian of Denverbut, nevertheless, with the same restriction, that the amount of bonds “to aid in the construction of their line” should be no greater than “they would have been entitled to if they had connected their said line with the Union Pacific Eailroad at the one hundredth degree.”
Here it may be noted that the length of the original route from the mouth of the Kansas to the one hundredth meridian, for which bonds were subsequently issued, is 394 miles; that the length of the road constructed by the Kansas Pacific company from the mouth of the Kansas to Denver is 665 miles; that the length of the remaining link of road constructed by the claimants, from Denver to the intersecting point at Cheyenne, is 106 miles j and that the amount of the mortgage on the bonds advanced to the Kansas Pacific company is $6,303,000. In other words, a route of 771 miles of road has been constructed, and the Government loan has contributed to 394 miles thereof.
So far the rights and equities of the Government as mortgagee remained unimpaired by legislation. The terms of the mortgage continued unchanged; the amount of the loan was not enlarged; the security pledged by the mortgage was considerably augmented. At the same time there was nothiug in either of the statutes to prevent the Kansas Pacific company from transferring the whole or a portion of their projected road to third parties, subject, of course, to the operation of the mortgage. Unquestionably the Kansas Pacific company could not *257 have shaken off by any act of their own the incumbrance from any portion of their property, and a purchaser of the equity of redemption would have been no better off than the mortgagor, save, perhaps, in the remote equitable right of having the grantor’s residue of the property first exhausted if the mortgage should be brought to a foreclosure. The point, therefore, to be determined is whether Congress by.any subsequent act have severed the franchise of the Kansas company, and permitted the claimants to construct this portion of the line unincumbered by the prior mortgage that otherwise would have attached.
That point' necessarily depends upon the construction which should be given to a single statute, the Transfer Act, 3d March, 1869. (15 Stat. L., 324.) But, for the better interpretation thereof, the circumstances existing at the time of its enactment should be understood.
In the first place, the Pacific Railroad acts relate to three distinct subject-matters: 1. To the incorporation of the companies with the obligations and conditions imposed upon the franchise. 2. To certain grants of portions of the public lands, intended as a gift, or bonus, conforming with the policy known as the land-grant railroad-system. 3. To the loan of Government bonds to aid in the construction of the roads, and the statutory mortgage therefor, which have already been described.
In the second place, the Kansas Pacific company had then constructed their road to Sheridan, a distance of 440 miles from its eastern terminus, and had received all of the Government loan which they would ever be entitled to receive. But they had remaining unconstructed a line of 225 miles from Sheridan to Denver, and of 106 miles from Denver to Cheyenne, or some other point of junction with the Union Pacific Road.
In the third place, the Denver Pacific company had acquired a right of way from Denver to Cheyenne, presumably under the Acts 4th August, 1852, (10 Stat. L., 28,) 3d March, 1855, (id., 683,) and 15th July, 1862, (12 id., 577,) and had partially constructed this road-bed without a land-grant and without a Government loan. Conversely, they had not assumed any of the obligations imposed by the Pacific Railroad acts, nor was their franchise restricted by any of those conditions.
The Transfer Act, 1869, (15 Stat. L., 324,) now to be construed, is in these words:
“ An act to authorize the transfer of lands granted to the Union *258 Pacific Railway Company, eastern division, between Denver and the point of its connection with the Union Pacific Railway, to the Denver Pacific Railway and Telegraph Company, and to expedite the completion of'railroads to Denver, in the Territory of Colorado.
“Seo. 1. That the Union Pacific Railway Company, eastern division, be, and it hereby is, authorized to contract with the Denver Pacific Railway and Telegraph Company, a corporation existing under the laws of the Territory of Colorado, for the construction, operation, and maintenance of that part of its line of railroad aud telegraph between Denver City and its point of connection with the Union Pacific Railroad, which point shall be at Cheyenne, and to adopt the road-bed already graded by said Denver Pacific Railway aud Telegraph Company as said line, and to grant to said Denver Pacific Railway and Telegraph Company the perpetual use of its right of way aud depot-grounds, aud to transfer to it all the rights and privileges, subject to all the obligations pertaining to said part of its line.
“Sec. 2. That the said Union Pacific Railway Company, eastern division, shall extend its railroad and telegraph to a connection at the city of Denver, so as to form with that part of its line herein authorized to be constructed, operated, aud maintained by the Denver Pacific Railway and Telegraph Company, a continuous line of railroad and telegraph from Kansas City, by way of Denver, to Cheyenne. And all the provisions of law for the operation of the Union Pacific Railroad, its branches and connections, as a continuous line, without discrimination, shall apply the same as if the road from Denver to Cheyenne had been constructed by ths said Union Pacific Railway Company, eastern division; but nothing herein shall authorize the said eastern division company to operate the road or fix the rates of tariff for the Denver Pacific Railway and Telegraph Company.
“ Sec. 3. That said companies are hereby authorized to mortgage their respective portions of said road, as herein defined, for an amount not exceeding thirty-two thousand dollars per mile, to enable them respectively to borrow money to construct the same; and that each of said companies shall receive patents to the alternate sections of land along their respective lines of road, as herein defined, in like manner and within the same limits as is provided by law in the case of lands granted to the Union Pacific Railway Company, eastern division: Provided, That neither of the companies hereinbefore mentioned shall be *259 entitled to subsidy in United States bonds under the provisions of this act.”
As to the construction which should be given to this statute a majority of tlie court have reached the following conclusions:
1. The controlling purpose of the statute was to exempt the Kansas Pacific company from building a competing road between Denver and Cheyenne, and to enable the Denver Pacific company to participate in the land-grants which had been assured to all of the companies engaged in the enterprise of building the Pacific roads, and at the same time to secure to the Government or to the public the continuous lines of railway which the Pacific Railroad acts contemplated. A secondary purpose which from the nature of things would have defeated the controlling purpose of the statute should not be aseribed'to Congress. To compel a road of 106 miles in length to become liable for the mortgage indebtedness of 394 miles of another road at $16,000 per mile, and, moreover, to compel it to contribute immediately from its earnings toward paying the interest on the mortgage-debt, seems to us such an inconsistent purpose. Congress, we think, could not have intended by mere implication to have continued a condition that would have defeated the end which all parties had in view.
2. Express words of relinquishment were not necessary in the statute as if there had been a thing in esse actually bound and incumbered by the statutory mortgage. It had been created ipso facto by the issue of the bonds, (Pacific Railroad Act, 1862, § 5,) and doubtless was intended to operate prospectively so as to embrace property subsequently acquired, such as ex. gr. the rolling-stock; but, nevertheless, as a matter of fact, when the Transfer Act passed, the mortgage was not resting upon any of the property now possessed by the Denver company. The mortgagors had not acquired title to the public lands west of Denver, they had not constructed a railroad there, nor did they possess anything beyond their franchise. The thing transferred was their naked right to acquire property to which the mortgage might attach, and not property already possessed .and incumbered. Amid such circumstances it seems to us that if Congress, when consenting to the transfer of the right, had intended that the thing subsequently to be acquired under it should be bound for a specific debt of the grantors the intent would have been clearly expressed in the statute.
*260 3. The vital words of the statute, “ to grant to said Denver Pacific Railway and Telegraph Company the perpetual use of its (the Kansas Pacific company’s) right of way and depot-grounds, and to transfer to it all the rights and privileges, subject to all the obligations pertaining to said part of its line, (§ 1,) do not necessarily imply that the “ grant ” was to be taken subject to the debts of the grantor; for, in the first place, the term “ obligations ” does not necessarily relate to the mortgage, inasmuch as an obligation to pay does not ipso facto spring out of an incum-brance or mortgage; and, in the second place, .the term is abundantly satisfied by the obligations which were personal, i. e., not running with the land, but growing out of and relating to the franchise and corporate, duties of the Kansas Pacific company; and, in the third place, the provision is expressly limited and confined to obligations "pertaining to said part of its line? To say that obligations pertaining to a specific portion' of the Kansas Pacific company’s line should be construed to read, (in the language of the Pacific Railroad Act, 1862, § 5,) the “ mortgage on the' whole line of railroad and telegraph, together with the rolling-stoeh, fixtures, and property of every hind and description j” or that “ obligations pertaining” to this portion of the line should be construed to mean participation in the payment of a debt incurred on a distinct and different portion of the line, seems to us a forced and artificial construction, foreign to the plain purpose of the act. Ko “ obligation ” to contribute to a special fund for the payment of a specific mortgage-debt of the other company antecedently rested on the Denver company; and none would be implied generally at law unless the grant had been in terms made subject to the mortgage. What the Denver company are required by the statute to assume are those things which the Kansas company were required by law to do pertaining, relating, belonging exclusively to this portion of the line, and not those things which appertained, related, or belonged generally to the whole of their line. In our view of the statute, the “ obligations pertaining ” to that part of the line which was to be transferred to the Denver Pacific company were corporate obligations — to complete the road, to equip it, to operate it, and to transport the Government mails and supplies at fair and reasonable rates, not exceeding the rates paid by private parties for the same kind of service.
*261 4. The second section of the Transfer Act appears to us to be in harmony with the construction which we have given to the first. It manifestly relates to those provisions of the Pacific Railroad Acts which require the different companies forming the system, while continuing distinct and independent corporations, nevertheless to unite in forming a continuous line. The purpose of the section manifestly was to make the Denver road a link in the chain, but yet to leave it free from all dictation on the part of the Kansas company. If it had been intended that the former company should immediately contribute toward the payment of the debt of the latter, some provision would have been necessary for an adjustment and settlement of the accounts between the companies, or some declaration to the effect that the Denver company should have no right of action over against the other. Standing in the position which the United States have seen fit to occupy toward these roads, it manifestly was for their interest that no such complications should arise, and that every member of the system should have clearly-defined rights and responsibilities, and that the enterprise both as a whole and in each of its corporate parts should be crowned with success.
5. In like manner, the third section of the Transfer Act appears inconsistent with the liability which the defendants now seek to throw upon- the Denver company. The Amendment Act, 1864, provided for-and contemplated two mortgages upon the roads. The first of these was to be in favor of third persons for $16,000 a mile, and the second, the statutory mortgage in favor of the Government, also for $16,000 a mile,' making the aggregate of the incumbrances $32,000 a mile. The Transfer Act adopts the same limitation, authorizing the Denver company to mortgage their road “for an amount not exceeding $32,000 per mile.” It does not seem possible that Congress could have intended in a vague and roundabout way to diminish the mortgage on the Kansas road by shifting practically a proportionate part of the debt to the Denver company, nor to have imposed upon the Denver company a mortgage which would practically amount to more than $8,000 a mile in excess of the $32,000 a mile expressly designated by the statute as the limit of their mortgage incumbrances.
6. It must also be noted that if the Transfer Act was intended to make the franchise and property of the Denver company *262 subject to the mortgage of the Kansas company, it will not only give to the Government the right of withholding from the former company one-half of such moneys as may be owing to them for mail-transportation, but will also compel them to apply “at least 5 per centum of the net earnings” of their road upon this indebtedness of the other company, (Act 1862, § 6,) for that additional source of payment is equally a condition of the mortgage. In like manner the.incumbrance must be extended not only to the lands granted, but also to the rolling-stock and personal property of the company, i. e.. in the words of the mortgage, “to property of every Mud and description” which the claimants may possess. (Act 1862, § 5.) That such could not have been the intent of Congress we think is clear, not only for the reasons before stated, but also for the reason that, in the previous legislation affecting roads benefited by the loan, Congress made the grants in terms subject to the “conditions” imposed upon the Union Pacific company, (Act 1862, § 9; Act 1864-, § 9,) (a term properly referable to property and to a mortgage,) while in the Transfer Act the term “condition” is dropped and “obligation” is substituted for it„ — a term not properly referable to land nor to a mortgage, but imposing personal or corporate duties upon the party obligated.
7. The acts relating to the Union Pacific Railroad and its branches contemplate a continuous line of road formed by local railroads belonging to different companies, and they thus constitute a system of enactments in pari materia which are to be construed together without reference to their dates and as one act. And the Amendment Act of 1864, (§ 7,) provides as follows: “And the failure of one company to comply fully xoith the conditions and requirements of this act, and the act to which it is amendatory, shall not worlc a forfeiture of the rights, privileges, or franchise of any other company or companies that shall have complied with the same.”
This as it stands is a general provision relating to all the acts up to its date, and by the rules of construction it is applicable to subsequent acts in pari materia and branch roads subsequently created and forming a part of the continuous line of road. We think that, by force of the provisions, the Denver company is not liable for the mortgages or debts of the Kansas company.
It was understood on the argument that the decision upon *263 this demurrer would be regarded as final in this court, neither party caring to present facts which do not appear on the record; but the judgment of the court will be in the usual form, viz, that the demurrer be overruled with leave to the defendants to answer over. If no such answer be filed within thirty days the claimants may move that judgment be entered for the amount demanded in the petition, or for such other amount as may be agreed upon by stipulation.