72 U.S. 107 (____)
5 Wall. 107
HADDEN
v.
THE COLLECTOR.
Supreme Court of United States.

*109 Messrs. Slosson and Hutchins, for the plaintiffs in error.
Mr. Stanbery, A.G., and Mr. Ashton, Assistant A.G., contra.
Mr. Justice FIELD delivered the opinion of the court.
This case arises upon the fourteenth section of the act of Congress of July 14th, 1862, entitled "An act increasing temporarily the duties on imports, and for other purposes." That section provides that after the first day of August, 1862, "there shall be levied, collected, and paid on all goods, wares, and merchandise of the growth or produce of countries beyond the Cape of Good Hope, when imported from places this side of the Cape of Good Hope, a duty of ten per cent. ad valorem, and in addition to the duties imposed on any such articles when imported directly from the place or places of their growth or production."[*]
Soon after the passage of this act the plaintiffs made several importations into the port of New York from Liverpool, England, of packages of raw silk, the product of Persia and China, upon which the ten per cent. duty was exacted. This duty was paid under protest, and the present action was brought against the collector to recover back the amount.
At the time the act was passed raw silk was not subject to any duty, and it was contended by the plaintiffs in the court below, and is contended by them here, that the fourteenth section only applied to such articles, the growth and product of countries beyond the Cape of Good Hope, as were then liable to duty, and did not embrace articles upon which no duty was imposed.
In support of this construction reference is made to the language of other sections of the act, where a duty is laid *110 upon articles previously exempt; to the title of the act; and to the supposed policy of the government.
It is true that some of the other sections, when providing for a duty upon articles previously exempt, express the intention of the legislature in this respect in language free from doubt. This fact, however, does not necessarily control the construction of a distinct and independent section. The fourteenth section relates to articles different from those covered by the other sections, and necessarily differs from them in its language, as it makes a discrimination, which they do not, in the duty imposed, according to the place from which the articles are exported.
The title of an act furnishes little aid in the construction of its provisions. Originally in the English courts the title was held to be no part of the act;  "no more," says Lord Holt, "than the title of a book is part of the book."[*] It was generally framed by the clerk of the House of Parliament, where the act originated, and was intended only as a means of convenient reference. At the present day the title constitutes a part of the act, but it is still considered as only a formal part; it cannot be used to extend or to restrain any positive provisions contained in the body of the act. It is only when the meaning of these is doubtful that resort may be had to the title, and even then it has little weight. It is seldom the subject of special consideration by the legislature.
These observations apply with special force to acts of Congress. Every one who has had occasion to examine them has found the most incongruous provisions, having no reference to the matter specified in the title. Thus the law regulating appeals in Mexican land cases to the District Courts of the United States from the board of commissioners, created under the act of March 3d, 1851, is found in an act entitled "An act making appropriations for the civil and diplomatic expenses of the government for the year ending June 30th, 1853, and for other purposes."[] The law declaring that in the courts of the United States there shall be no exclusion *111 of any witness on account of color, nor in civil actions when he is a party to or interested in the issue tried, is contained in a proviso to a section in the appropriation act of 1864, the section itself directing an appropriation for detecting and punishing the counterfeiting of the securities and coin of the United States.[*]
During the past session, whilst a bill was pending before Congress entitled "A bill granting the right of way to ditch and canal owners over the public lands, and for other purposes," all after the enacting clause was stricken out, and provisions establishing a complete system for the possession and sale of interests in mines were substituted in its place. And thus the most important act in our legislation relating to the mining interest of the country stands on the statute-book under a title purporting that the act grants a right of way to ditch and canal owners over the public lands, and for other purposes.[] The words "for other purposes," frequently added to the title in acts of Congress, are considered as covering every possible subject of legislation.
The supposed policy of the government is stated to be the encouragement of manufactures by imposing restrictions on goods manufactured in whole or in part abroad, and hence it is argued that it was against such policy to impose duties on the raw material.
Little weight can be given to considerations of this character in the construction of the act. The encouragement of manufactures does not appear to have been the object of the act; but, on the contrary, its object was manifestly to increase the revenues of the country, and it may well have been supposed by the law-makers that in many cases the raw material could bear a duty without decreasing the importation, or injuriously affecting the manufacturing interests.
What is termed the policy of the government with reference to any particular legislation is generally a very uncertain thing, upon which all sorts of opinions, each variant *112 from the other, may be formed by different persons. It is a ground much too unstable upon which to rest the judgment of the court in the interpretation of statutes.
Looking to the section by itself, we find no little difficulty in its construction. The first clause declares that upon all goods, wares, and merchandise, the growth or product of countries beyond the Cape of Good Hope, when imported from places this side of the Cape, a duty of ten per cent. ad valorem shall be levied, and the latter clause does not qualify this general language so as to exclude from it the articles previously exempt. It only provides, as we construe it, that the duty laid by the first clause shall be in addition to existing duties imposed on such articles when imported directly from their places of growth or production; in other words, that such articles as already pay a duty when imported directly from these places shall pay a further duty if imported from places this side of the Cape; its object being to increase the duty upon the articles when not imported directly from their places of growth or production. The words "any such articles" do not mean all the articles embraced in the first clause, but only such of them as were already subject to duty.
The amendatory act of March 3d, 1863, passed a few months afterwards, indicates very clearly the understanding of Congress that the ten per cent. was imposed as an additional duty, though in fact raw silk, as already stated, was at the time exempt. Its language is that the fourteenth section shall be modified so as to allow "cotton and raw silk, as reeled from the cocoon, to be exempt from any additional duty when imported from places this side of the Cape of Good Hope for two years" from the passage of the act.[*]
The objection to the statute that it makes a discrimination in favor of the ports of the Pacific, and thus contravenes that clause of the Constitution[] which requires that "all duties, imposts, and excises shall be uniform throughout the United States," is not tenable. The ground of the objection is that *113 with reference to the Atlantic ports, goods which are the growth or product of Persia or China, are from countries beyond the Cape of Good Hope, and are thus chargeable with duty, but with reference to the Pacific ports, they are from countries this side of the Cape, and thus not within the terms of the statute.
The answer to the objection is obvious and conclusive. The terms "beyond the Cape of Good Hope" are employed as descriptive of the locality of certain countries, not their relative position with respect to ports of import. They are used to avoid the necessity of enumerating the countries which lie cast of the Cape. "Beyond the Cape" and "east of the Cape" are often used in the acts of Congress as equivalent expressions. They indicate the locality of certain countries with reference to the position of the law-makers at the national capital. In a similar manner would the words "beyond the Mississippi" be construed if found in an act of Congress. They would be held to refer to the country west of the Mississippi, which, with reference to the legislators at Washington, would lie beyond that river.
JUDGMENT AFFIRMED.
NOTES
[*] 12 Stat. at Large, 557.
[*] Mills v. Wilkins, 6 Modern, 62.
[] 10 Stat. at Large, 98.
[*] 13 Stat. at Large, 351.
[] 14 Id. 251.
[*] 12 Stat. at Large, 742.
[] Art. 1, § 8.