Howry, J.,
delivered the opinion of the court:
Plaintiff was a lieutenant-commander in the Navy March 3, 1899. He was on shore duty at a naval station in the Philippine Islands in 1900, and for his service he was paid shore-duty pay of an officer of his grade, computed according to anny rates, including 10 per cent increase for service in the islands, as provided bjr the army appropriation act of May 26, 1900. (31 Stat. L., 205.) The increase was computed upon the minimum pay of his grade. He was furnished during the period of his service on shore with one room as quarters, but if he had been assigned the same quarters as an army officer of his corresponding rank he would have been provided with four rooms.
The claim is for the full pay of an army officer of his corresponding rank as for service beyond seas, without deduction for service on shore, with the 10 per cent increase for service in the islands computed upon his full pajr instead of upon his minimum pay, adding the commutation price of three additional rooms for quarters during the time he was furnished with but one room.
*95 Thus, three questions are presented. They all depend for their determination upon the proper construction of the act of March 3, 1899, commonly known as the navy personnel act (31 Stat. L., 1007), and two subsequent acts, approved respectively May 26, 1900 (31 Stat. L., 211), and March 3, 1901 (31 Stat. L., 1108). The questions are important beyond the amount directed to be paid or withheld in this case as being of a class affecting the pay of naval officers serving in the Philippines.
After providing that the commissioned officers of the line of the Navy and of the Medical and Pay Corps shall receive the same pay and allowances, except forage, as are or may be provided for officers of corresponding rank in the Arnry, limited by 15 per cent less pay for shore duty, it is by section
13 off the act of 1899 (supra)—
ii Provided further, That when naval officers are detailed for shore duty beyond seas they shall receive the same pay and allowances as are or may be provided by or in pursuance of law for officers of the Army detailed for duty in similar places. ”
If the question of pay could be determined by the authorities which give a literal meaning to the words “ beyond seas,” plaintiff’s contention upon the first question would seem correct.
In Lane v. Bennett (1 Meeson & Welsby) it was held that Ireland was a place beyond seas within the meaning of the words as used in the statute of limitations. This was the early rule. (1 Shower, 91.) In Battersby v. Kirk (2 Bingham, New Cases, 584) the subject was reviewed, and it was held that Ireland was beyond seas with reference to England since its union with Great Britain as well as before.
In King v. Walker (1 William Blackstone, 286) it was held that a person in Scotland was not out of the realm after the union with England, because there was no such kingdom as England after that union. According to the opinion England was an island by itself before the union, and Scotland becoming a part of it afterwards, one of the judges stated that the “legislature by altering the phrase to beyond the seas at a critical juncture seemed to have pointed at this very case, of dwelling in Scotland.”
*96 In Nightingale v. Adams (1 Shower, 91) India was said to be bt^ond seas.
In Williams v. Jones (13 East, 439) it was shown that the defendant resided in India and the case was adjudged to be within one of the exceptions of the statute of limitations as to parties beyond seas.
Again, if the question of shore pay or sea pay could be determined by the authorities Avhich have given a construction to the Avords when used in statutes of limitations in the American States we should find according to some of them that the words ‘‘ beyond seas ” mean “ out of the State. ” But again, if the issue could be settled by a less-restricted meaning Ave should find that precedents are not wanting which hold that the same words mean ‘4out of the United States.” Courts of last resort in eight States construe the phrase as first stated — that is, to be beyond seas one must be out of the jurisdiction of the State, while the courts of last resort in seA'cn other States haAm settled upon that interpretation which places a person beyond seas as out of the United States.
It is needless to discuss these authorities in detail. They are referred to on the briefs of counsel and likewise in an opinion from the Treasury in another case deciding this question adversety where the contention was that the HaAvaiian Islands Avere not beyond seas within the contemplation of the act under which that, as Avell as this claim, have been made. Their persuasive character, eAren if it could be said that the question involved is exactly analogous to this issue, is greatly lessened by the different views expressed. At the same time it is probably true, as stated by the Comptroller of the Treasury, that in none of the States where the subject has been under consideration has the expression been literally construed. (7 Comp. Dec., 115.) So far as the American decisions go, there does not seem to have been any occasion for going into the status of a person in the island possessions of the United States. The time had not come for that when the cases were considered. . •
Generally speaking, “beyond seas” means out of the Kingdom of England; out of the State; out of the United States. (Bouv. Law. Diet.)
*97 In wbat sense did Congress use the words in the act under consideration ? And what was the measure of pajr intended to be given to naval officers serving in the new acquisitions of the United States?
It is said, citing Black on Interpretation of Laws, that when an act of Congress uses a technical term which is known, and its meaning is clearly ascertained by the common or the civil law,JErom one or the other of ivhich it is obviously borrowed, it is proper to refer to the one from which it is taken for its meaning, and that Congress must be presumed to have used the language of the proviso according to what is claimed to be the established legal interpretation in this country and in England, unless it appears from the act that there was an intention to use the language in its literal sense,'
The diverse views as to where a person had to be in order to be beyond seas leaves room to doubt whether Congress adopted the proviso with reference to anjr of the adjudicated cases. Rather should resort be had, if there be any ambiguity or doubt, to the circumstances surrounding the passage of the act, the history of the times, and the defect which the statute was intended to remecty. (Smith v. Townsend, 148 U. S., 490.)
At the time of the enactment the relinquishment of all claim of sovereignty over and title to Cuba by Spain was provided for in a treaty then pending, and Spain had ceded to the United States by the same instrument the islands of Guam and Porto Rico and the archipelago known as the Philippines. Technically none of the territory included in the treaty belonged to the United States. But the ratification was accepted as a foregone conclusion, inasmuch as the proclamation closing the negotiations only awaited the willing action of Spain. The civil and political rights of the native inhabitants of the islands remained open as the treaty became operative, to be determined by Congress, there being an express stipulation to that effect.
Cuba was to become a protectorate under our Government, to be held as a dependency until such time as it could be granted political autonomy. All the islands were in possession of the armed forces of the United States. Legislation ivas *98 then being directed to strengthening the Army and increasing the efficiency of the Navy. It was far from certain that with the close of the war with Spain peace and tranquillity would at once ensue among the people whose duty it was by the treaty and by previous conquest to submit to the authority of the United States. It was universally conceded that a necessity existed for the maintenance of a large military and naval force in the new acquisitions to prevent disorder and to maintain the authority of the United States while adjusting the native inhabitants to the new conditions imposed by change of government.
The cost of living was well understood to be greater in all the islands than at home, while there appeared greater obstacles to health and pleasure in a tropical climate than in the more temperate zone of our own country.
It was then a disputed question which time has not wholly cleared, whether upon the exchange of ratifications the new territory became an integral part of the United States, with the right on the part of their inhabitants (as Congress came to exercise jurisdiction) to be governed by the same Constitution and laws which apply to us, or whether the now acquisitions continued to be foreign and external, without the right by its people to claim the privileges accorded to citizens residing in Territories within the continental limits of the United States.
Since the decisions of the Supreme Court referring to the relations which the newly acquired countries and their inhabitants bear to the United States, it is neither important nor useful in the determination of the issue now presented for this court to enter that field of discussion. If stated, these views would perhaps only emphasize differences of opinion, as far as it would now be permissible to state them.
The decisions of the court of last resort in what have come to be known as the insular cases have gone far enough to clearly establish two propositions. Constitutional provisions and limitations do not control Congress in legislating for the inhabitants of the ceded territory in matters of taxation and the regulation commerce. Congress may direct otherwise, but not until after that body shall determine a different policy can the people of the newly acquired acquisitions claim any- *99 tiling different from that state of affairs established by these cases. (De Lima v. Bidmell, 182 U. S., 244; Downes v. Bidwell, 182 U. S., 244; Dooley v. United States, 183 U. S., 151; Fourteen Diamond Rings v. United States, 183 U. S., 176.)
It is not, as we view it, material to the -inquiry now to know that the decisions only establish the want of commercial unity in the government and differences in the methods of taxation and the collection of revenue as between the people in the continental limits of the United States and the people of our new acquisitions. It is enough to say that none of these questions were settled when the statute we are considering was enacted, and that the uncertainty covered not merely these points but others as well. The new acquisitions were regarded by some, on the exchange of ratifications, as domestic territory, and by others as yet so foreign as never to become like one of our Territories at home, but dependencies out of the jurisdiction of the United State, until incorporated; by some as one country, covered by one flag, with one kind of government, while others yet did not deem it incompatible with our Constitution.and laws to maintain a distinct power and a separate government over the conquered people until Congress should decide otherwise in the indefinite future.
It does not seem to us reasonable to say that Congress intended to give this increase to naval officers serving in Cuba at our very doors and to withhold it from those serving thousands of miles off in the Philippine Islands. It is even less reasonable to say that it was intended that the few officers serving as naval attaches at foreign legations should have an increase in their pay while'the same increase was.denied officers engaged in far more arduous service abroad. We say “abroad” because, in a substantial sense as well as from a technical point of view, a large part of our naval force was on the other side of the world and beyond seas from the seat of government. Said the Supreme Court:
“Beyond the cape and ‘east of the cape’ are often used in the acts of Congress as equivalent expressions, and they indicate the locality of certain countries with reference to the position of the lawmakers at the national capital. In a similar manner would the words ‘beyond the Mississippi’ be considered, if found in an act of Congress. They would be held *100 to refer to a country west of the Mississippi, which, with reference to the legislators at Washington, would lie beyond that river.” (Hadden v. Collector, 5 Wall., 107, 113.)
The difficulty with the present Government contention is that the law would be discriminative without reason for its partiality. We say “present” contention because when the statute took effect its provisions were practical^ applied to officers like plaintiff. The accounting officers deemed him to be within the statute, but subsequent consideration brought about a change of views, and naval officers serving on shore, though far from home, were denied payment to await the decisions of the courts. Without affecting any but those in Cuban ports (where our officers were not expected to remain) and the few connected with the diplomatic service (where the duties wore light), the statute would have but little to operate upon.
Our conclusion is that as the language does not justify the exclusion of those on shore duty in the Philippine Islands, but, on the contrary, the sound principles of the statute would be defeated by depriving officers there of the pay claimed, and plaintiff should recover the difference between the shore pay he has already received and the sea pay to which he is entitled.
Another aspect to this part of the controversy remains. IN the act of March 3, 1901 (31 Stat. L., 1108), Congress provided that officers “who have been detailed, or who may hereafter be detailed, for shore duty in Alaska, the Philippine Islands, Guam, or elsewhere beyond the continental limits of the United States shall be considered as having been detailed for-‘shore duty beyond seas,’ and shall receive pay accordingly.” It seems to us clear that this act relates back to the original statute. The language is that officers “who- have been,” etc., “shall be considered,” etc., not shall hereafter be faid. An officer’s account is always open. “Shall be considered” refers to anj^ or a final adjustment of an officer’s account.
We are not unmindful of the general rule that statutes shall not have a retroactive effect. But exceptions do exist, and the language of the act of 1901 (su])ra) immediately points to the intent of the previous act on the subject and declares its meaning, if there was then any doubt of its previous opera *101 tion. The accounting officers had raised a doubt. Congress ■had the privilege of restating the meaning of the first statute, and wo think that body removed the objections taken at the Treasury.
The next question for determination on this branch of the case relates to the 10 per cent increase allowed for service over and above the rates fixed by law in times of peace, and the proper method of calculating the increase.
The act of May 26, 1900 (31 Stat. L., 211), is an army act. It provides:
“That hereafter the pajr proper of all officers and enlisted men serving in Porto Rico, Cuba, the Philippine Islands, Hawaii, and the Territory of Alaska shall be increased 10 per centum for officers and 20 per centum for enlisted men over and above the rates of pay proper as fixed by law in times of peace.”
Under the operation of the acts of March 3, 1899, and March 3, 1901, plaintiff claims that as his service on shore at the Cavite Naval Station was shore duty beyond seas ho is entitled to the full sea pay of his rank while on such dut}r, as provided by law for officers of the Army of corresponding rank similarly detailed, and that the increase of the pay proper of officers and enlisted men made in the Army appropriation act of May 26, 1900, grants to him, under the operation of the act of March 3, 1899, an increase of 10 per cent of his pay proper, such pay proper being the sum of $3,500 a year as the pay of an officer of his rank of more than twenty years’ sol'vice. But the question is whether the increase shall be calculated upon the minimum pay of the grade or upon the total pay, including longevity increase. In other words, shall the increase be computed upon $2,500, constituting the lowest pay of a lieutenant-commander, or upon $3,500, constituting the total pay which carries the amount of the longevity increase?
The proper determination of the question depends upon the true meaning of the words “pay proper” as they appear in the statute.
It is insisted by the. defendants that in using the words “pay proper” the minimum pay of the grade is the true basis *102 of calculation. That is the construction of the accounting-officers (1 Comp. Dec., 668, and 6 Comp. Dec., 944).
The want of any statutory definitioiisOr direct judicial determination involves the matter in doubt as to whether “pay” and “pay proper” are equivalent, and whether the word “proper” refers to any special kind of payor only means that compensation which is properly called “pay.”
Military lexicons disclose differences between pay and allowances to officers. These differences nowhere appear more clearly stated than in Sherburne's case (16 C. Cls. R., 491), in which, quoting from Scott’s Military Diction ary,, it is shown that—
“Pay is a fixed and direct amount given by law to persons in the military service in consideration of and as compensation for their personal service. Allowances, as they are now called, or emoluments, as they were formerly termed, are indirect or contingent remuneration which may or may not be earned, and which is sometimes in the nature of compensation and sometimes in the nature of reimbursement.”
In Tyler v. United States (16 C. Cls. R., 223) the method of computing longevity pay prescribed bv section 1262 of the Revised Statutes was declared to be not by taking- one-tenth of the officer’s fixed annual pay, but one-tenth of his current yearly pay; that is, his second longevity pay to include 10 per cent of his first longevhy pay, subject to another provision limiting the total amount of such increase to 40 per cent of the fixed annual pay. In affirming this judgment, Mr. Justice Miller, for the Supreme Court, said that — ■
“The words ‘current yearly pay’ require that when the increased pay for any period of five years is to commence the 10 per cent must be counted on the regular salary added to its increase by any previous periods of five years; so that the original salary of the rank and any additions of 10 per cent previously earned for periods of five years constitute the current yearly pay on which said 10'per cent is to be calculated.” (105 U. S., 244, 246.)
In Emory v. United States (19 C. Cls. R., 255) it was held that the “three months’ extra pay” given to those who served in the war with Mexico, by the acts of 1848 and 1879, is pay proper, not pay and allowances. This opinion treats “paj7” and “pay proper” as interchangeable terms.
*103 An officer’s annual pay implies a pay subject to change. When the longevity increase attaches it is as much of the officer’s proper pay as the amount first fixed.
Pay proper is pajr regulated by service. It depends upon the officer’s longevity. Longevity arises out of length of service and is founded on that. The pay proper in such a case is determinable upon an officer’s lustrum — the amount he is to receive for every five years’ period of service.
Longevity paj' provisions are a legislative convenience. They go hand in hand with the officer’s pay as the years add to his term of service. These provisions say in effect that a major shall receive, during the first five years of service, $2,500; during the second, $2,750, etc. Thus longevity- pay is as fixed and certain as if actual amounts had been named.
From these views we think that the computation made upon the minimum pay of the grade is erroneous. Plaintiff is therefore entitled to the $256.35 first allowed him by the accounting officers, but afterwards checked against his pay, and to an addition of $26.39 as the 10 per cent increase upon his longevity pajT, making a total of $282.71.
The third question presented relates to the commutation for quarters. It appears that plaintiff had but one room furnished him for quarters because there were no other public quarters available at his station. Commutation is claimed for three rooms not furnished.
In the opinion of this court contemporaneously announced herewith in Odell v. United States (post), it is shown that the theory of commutation'is compensation or reimbursement for something paid out. The only difference between this case and Odell’s is that here one room only was available, whereas Odell found not even one room available, but occupied quarters assigned to another officer by the consent and courtesy of the officer first in possession. In both cases the officer claiming commutation was relieved from expense and neither became entitled to recover, from defendants the value of quarters not paid for by the officer. As no expense was incurred, this part of the claim must be denied.
Judgment for $282.71 will be entered in plaintiff’s favor.