UNITED STATES v. ERIE R. CO. (two cases).

(District Court, S. D. New York. April 29, 1914.)

CARRIERS (§ 32*)—REGULATION—INTERSTATE COMMERCE ACT—"COMMON CAR-
RIER."

Interstate Commerce Law (Act Feb. 4, 1887, c. 104, 24 Stat. 387 [U. S.
Comp. St. 1901, p. 3171]) § 22, provides that nothing contained in the act
shall be construed to prevent the principal officers of any railroad com-
pany from exchanging passes or tickets with other railroad companies for
their officers and employés. Hepburn Act June 29, 1906, c. 3591, 34 Stat.
584 (U. S. Comp. St. Supp. 1911, p. 1288), declares that no common car-
rier "subject to the provisions of the act" after June 1, 1907, shall di-
rectly or indirectly issue or give any interstate free tickets, passes, or
transportation for passengers, provided that the provision shall not pro-
hibit the exchange of passes for officers, agents, and employés of com-
mon carriers and their families, and the amendment of 1910 (Act June
18, 1910, c. 309, § 7, 36 Stat. 544 [U. S. Comp. St. Supp. 1911, p. 1287])
declares that the provision shall not be construed to prohibit the privilege
of passes or franks or the exchange thereof between carriers for the of-
ficers, agents, employés, and their families of such telegraph, telephone,
and cable lines and the officers, agents, employés, and their families of
other common carriers, "subject to the provisions of the act." Held, that
the term "common carrier," as so used, was not limited to "common car-
riers subject to the provisions of the act," and hence a common carrier,
subject to the act, was not limited to the exchange of passes with other
carriers equally subject to the act, but was authorized to exchange passes
with transatlantic steamship lines and foreign railroads not subject to
the act.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig.
§ 32.*

For other definitions, see Words and Phrases, vol. 2, pp. 1313–1319;
vol. 8, p. 7607.]

Suits by the United States against the Erie Railroad Company. Suit
No. 1 was instituted by the United States against the railroad company
to restrain it from issuing passes to agents of transatlantic steamship
lines, and suit No. 2 to restrain it from issuing passes to the agent of
the Great Eastern Railway of England. On final hearing. Decrees
for defendant.

John C. Knox, Asst. U. S. Atty., of New York City.
George F. Brownell, of New York City, for defendant.

HOUGH, District Judge. From a date prior to 1887, and continu-
ously since that time, the Erie Railroad has been in the habit of issuing
passes to certain agents or officials of the transatlantic steamship lines
using the port of New York. Between the railroad and steamship
companies there has been an interchange of passes for the purpose
of maintaining relations from which profit was desired. The steam-
ship companies control much through freight; so does the Erie Rail-
road; and each hoped to get more freight through the influence of
those gratified by said interchange of passes. The Erie Railroad also
maintains an agent in England, whose business it is to solicit through
freight; he receives passes over the lines of the Great Eastern Railway

of England, in return for which the defendant issues a pass over its lines to the American agent of the English railway. This arrangement likewise has continued for many years and antedates 1887. It is admitted that the defendant is a corporation engaged in interstate traffic and is subject to the provisions of what is commonly known as the Interstate Commerce Law; and it is also admitted that neither the ocean carriers nor the Great Eastern Railway of England is subject to said act, although all are common carriers, within the ordinary meaning of those words.

Section 22 of the Interstate Commerce Law has from the passage of the first statute in 1887 contained these words:

"Nothing in this act shall be construed * * * to prevent the principal officers of any railroad company or companies from exchanging passes or tickets with other railroad companies for their officers and employés."

Since the Hepburn Act of 1906 the first section of the Interstate Commerce Law has contained these words:

"No common carrier subject to the provisions of this act, shall, after January 1, 1907, directly or indirectly issue or give any interstate free ticket, free pass or free transportation for passengers: * * * Provided, that this provision shall not be construed to prohibit the interchange of passes for the officers, agents, and employés of common carriers, and their families; nor to prohibit any common carrier from carrying passengers free with the object of providing relief in cases of general epidemic, pestilence, or other calamitous visitation."

The amendment of 1910 inserted the following words (next after those above quoted): ·

"And provided further that this provision shall not be construed to prohibit the privilege of passes or franks, or the exchange thereof with each other, for the officers, agents, employés, and their families of such telegraph, telephone and cable lines, and the officers, agents, employés and their families of other common carriers subject to the provisions of this act."

The proviso of 1910 is evidently intended to cover the case of employés of cable, telegraph, and telephone lines, which were in that year brought within the purview of the Interstate Commerce Law, but I am quite unable to see any reason for the rest of said proviso.

The object of these actions is to enjoin the defendant from continuing the long-standing practice above outlined because the common carriers or railroads referred to in the quoted sections of the law must be held to mean, not common carriers and railroads generally, but "common carriers subject to the provisions of this act." These suits were laid before the Commerce Court and were dismissed without prejudice because the court was divided in opinion. Shortly after the passage of the Hepburn Act, this question came before the Interstate Commerce Commission (Petition of Frank Parmelee Co., 2 Interst. Com. Com'n R. 39), and it was there plainly held that no interchange of passes would be permitted between ordinary common carriers or common carriers at common law and "common carriers subject to the provisions of this act." The position of the Commission is in substance that the general prohibition of the Hepburn Act is only modified by the proviso to the extent of "making a special exception of the giving of passes by way of interchange to the employés of any other

common carrier subject to the act." This seems to me assertion rather than reasoning, but there is really very little more to say about it. To decide this matter as one of law is making bricks without straw, for every one admits that the object of the court must be to carry out the intent of the Legislature; yet, if by "intent" is meant conscious purpose, it is, I think a safe presumption that Congress never considered the point here involved.

In the absence of any real intent, it is the habit of courts to endeavor to ascertain whether, from the language used, an imputed intent can be spelled out. Applying this method, it is a fair query to ask whether the context indicates throughout the act that "common carriers" is to be synonymous with "common carriers subject to the provisions of this act." As amended to date, I find the following instances of the use of the phrase "common carriers" in illustrative positions: In section 1 there is a proviso:

"That nothing in this act shall be construed to prevent telephone, telegraph and cable companies from entering into contracts with common carriers for the exchange of services."

Here "common carriers" must refer to common carriers generally, for otherwise telegraph and telephone companies might find themselves hampered in extending their business with concerns entirely unconnected with interstate commerce.

The penal provision which is a part of the anti-pass legislation begins with the expression:

"Any common carrier violating this provision shall be deemed guilty of a misdemeanor," etc.

Here the phrase evidently refers only to carriers subject "to the provisions of this act."

The provisions of section 1 relating to private sidings and lateral branch lines declare that, "if any common carrier shall fail to install and operate any such switch," the Commission shall investigate the matter, and make an order "directing the common carrier to comply with the provisions of this section." Here evidently the phrase can refer only to carriers "subject to the provisions of this act."

Section 3, relating to interchange of traffic, does not consistently use the phrase "carrier subject to the provisions of this act"; yet I think it plain that, in every instance where the phrase "carrier" is used, it means "carrier subject to the provisions of this act." Section 5 (the anti-pooling provision) prohibits combinations "with any other common carrier or carriers," which phrase I think is plainly intended to cover any and all carriers, whether the same be subject to the provisions of the Interstate Commerce Law or not. Section 6 (relating to published tariffs) does not always use the phrase "common carrier subject to the provisions of this act," but in my judgment it can only mean such carrier, as may be seen from the context. This is especially noticeable in the subsection relating to the expedition of military traffic in time of war, which declares that "carriers shall adopt every means within their control to facilitate and expedite the military traffic." This can only refer to "carriers subject to the provisions of this act." Section

13, which gives to "any common carrier" the right to complain of the acts or omissions of "any common carrier subject to the provisions of this act," specifically puts the two classes of carriers in contradistinction. In section 15 it is provided as proper for a common carrier to give information "to another carrier or its duly authorized agent for the purpose of adjusting mutual traffic accounts in the ordinary course of business of such carriers." The phrase "another carrier" must mean in many instances a carrier not subject to the provisions of this act. The reparation section (No. 16) provides that the Commission may make an order "directing the carrier to pay to the complainant the sum to which he is entitled." This, of course, can only refer to a "carrier subject to the provisions of this act," and the same may be said of the subsequent portions of the same section relating to the duty of carriers to comply with the Commission's order, the penalty upon a carrier for neglecting to obey an order, and the right of the Commission to apply for a court decree enforcing an order.

The so-called Carmack amendment to section 20 nowhere employs the phrase "carrier subject to the provisions of this act"; yet every carrier affected is in a certain sense within the provisions of the act. The language of this amendment, however, does not seem to me enlightening, because it is really new and different legislation not germane to the general purposes of the statute.

The foregoing examination of the act satisfies me that no attempt has been made to give to the phrases "common carrier" and "common carrier subject to the provisions of this act" an identical meaning, and all arguments based on such identity fail.

It is another admitted canon of interpretation that the statute is to be construed with reference to the object intended to be accomplished. The Interstate Commerce Law is clearly a remedial act and is to be benevolently interpreted, but it can hardly be said that it has been the intention of even its most affectionate supporters to bring all the business or all the operations of the "carriers, subject to the provisions of this act," within the compulsion of the statute. So far as many heads of legislation are concerned, it is historically known that only a small proportion of our legislators have been willing to extend the power of Congress over interstate commerce to its limit. It has hitherto been deemed sufficient to legislate over a limited field only; and I find it impossible to perceive, either in the language of the act, the history of its preparation, or the literature which has grown up around it, any clear intent to upset the settled habit, not only of this defendant, but all American carriers, of seeking or encouraging business in foreign fields, or fields not within the power of Congress, by methods which are still permissible within the congressional field of regulation. Admittedly the Erie Railroad can exchange passes with the New York Central, and why it is obnoxious to the object of the Interstate Commerce Law for the Erie to do the same thing with foreign carriers who are in business relations with it is more than I can see.

Indeed, the "object" of a statute rarely means more than a supposed governmental policy, and it has been said that such policy is too unstable a ground upon which to rest the judgment of the court in the

interpretation of statutes. Hadden v. Collector, 5 Wall. 107, 18 L. Ed. 518.

The argument of inconvenience is easy to advance, but very misleading. In doubtful cases it is true that a statutory construction occasioning great inconvenience or productive of inequality and injustice is not to be preferred if another and more reasonable construction can be found. Knowlton v. Moore, 178 U. S. 41, 20 Sup. Ct. 747, 44 L. Ed. 969. It is vigorously urged here as matter of notoriety that there are already municipalities in this country which are in a sense common carriers in that (in New York and Boston) they maintain ferries for hire, and also that the United States itself is reputed to own a railway common carrier in the Canal Zone, and is about to construct and operate a similar common carrier in Alaska. On these facts the argument is based that every official of the United States from the highest to the lowest, and all the officers or employés of New York and Boston, may be favored with passes to the great detriment of the public. The jumping of such intellectual fences as these may be left until we come to them. To my mind the argument only shows how fallacious is reasoning ab inconvenienti.

To sum this matter up, it is plain that the contention of the government is not to be found in the letter of the statute, nor is it discoverable in the spirit thereof, because there is no evidence of actual intent on the part of the Legislature, because, viewing the whole act, the phrase "common carrier" is not and was not intended to be synonymous with the phrase "common carrier subject to the provisions of this act," and because there is no reason shown why Congress should be thought to have given the privilege of exchanging passes with one kind of common carrier and not with another, when such exchanges are made and always have been made with all common carriers for the same reasons, viz., a desire to curry favor with persons having business to place.

If these well-known reasons no longer meet approval, if mutual backscratching has become sinful, the remedy is another statute, not stretching the present one.

Bills dismissed.