A legislative body has the inherent right, either directly or through committee, and by compulsory process, to obtain information that is pertinent to its duties. McGrain v.Daugherty, 273 U.S. 135; 71 L.Ed. 580; Burnham v. Morrisey
(Mass.), 14 Gray 226; Attorney-General v. Brissenden
(Mass.), 171 N.E. Rep. 82; People v. Keeler, 99 N.Y. 463.
"In actual legislative practice power to secure needed information by such means has long been treated as an attribute of the power to legislate. It was so regarded in the British Parliament and in the colonial legislatures before the American Revolution; and a like view has prevailed and been carried into effect in both houses of Congress and in most of the state legislatures." McGrain v. Daugherty, supra. Of course, the legislature may not assume court functions. It is *Page 351 
equally important that the courts should not impinge upon, or withhold recognition of, legislative powers. The state is a sovereign and the three branches of government share the sovereignty, not jointly, but, as to most matters, divisionally, extensive throughout the territorial expanse of the state; and the judiciary, given the final word, should speak that word with restraint, particularly when its effect will be to delimit the field of authority of one of the co-ordinate branches. Paul v.Gloucester County, 50 N.J. Law 585, 594. The three-fold division of governmental powers set up in article III of the New Jersey Constitution is substantially duplicated in article XXX of the Massachusetts Constitution. And where the division of powers is not so clearly made by constitutional provision it is nevertheless recognized as a fundamental principle of the American system. Kilbourn v. Thompson, 103 U.S. 168;26 L.Ed. 377; People v. Keeler, supra. The cited holdings may not, therefore, be brushed aside by the suggestion that there are constitutional differences between the several jurisdictions. Also, there are many quasi-judicial functions that are not judicial powers in a constitutional sense. McCran v. Gaul,95 N.J. Law 393. (The reasoning on this point adopted on appeal by the court of errors and appeals, 96 N.J. Law 165, 167.) I perceive no effort at the usurpation of constitutional judicial powers in the granting of so much authority as was necessary to support the incidents hereinafter mentioned, or in the inquiries addressed to the respondents or in the consequent arrests on complaints charging the commission of misdemeanors in violation of the statute.
The usual and by far the predominant function of a legislature is to pass laws. It follows that the assembly had the right to obtain information legitimately pertinent to the subject-matters upon which it was called to legislate. The elections constitute an essential and an exceedingly fertile subject of legislation. None more so or more appropriately so. The right to obtain information pertinent to the holding of elections is inclusive of the right to question an election *Page 352 
officer as to the actual distribution of duties between him and his fellow board-members in the counting of the ballots. There is no doubt in my mind of the authority of the assembly to seek enlightenment on the manner in which elections are actually conducted, and to seek it with the aid of compulsory process. Any other view would cut directly and seriously into the roots of our form of government.
Let us, then, consider whether the questions which the witnesses refused to answer and upon which the right of the assembly is challenged came reasonably within the scope of the power we have been discussing. There were three persons subpoenaed: James Martin, Christopher J. Kelly and John J. Gangemi, the respondents herein. These persons ignored the subpoenas but were produced upon warrants, and each was asked at least one specific question and a general question. The specific question to Martin and the answer thereto are as follows: "Q.
Did you tally the votes in the third ward of the ninth district on the evening of November 2d 1937? A. I refuse to answer that on advice of my counsel." Kelly's question and answer were these: "Q. Were you the member of the election board of the third ward, ninth district, Jersey City, on November 2d 1937, who read the ballots? A. I refuse to answer on advice of counsel. That goes for all." The specific question put to Gangemi and the answer given were: "Q. Were you the inspector in the third ward, ninth district in Jersey City, on November 2d 1937? A. I refuse to answer on advice of my counsel." The general question asked of Martin and the answer thereto, which may also be taken as typical of the other two instances, were: "Q. I take it that on advice of your counsel you now refuse to answer all questions which may be put to you concerning your conduct as a member of the election board of the third ward, ninth district, Jersey City, on November 2d 1937? A. Yes, sir." What could be more apt than the inquiries thus made, and how could refusal to answer be more positive? The specific questions come squarely within my conception of what the assembly was entitled to ask and to have *Page 353 
answered. They were clearly introductory and they in nowise constituted an inquiry into crime. With a wide field of pertinent inquiry upon the subject-matter of election machinery, its present operation and the opportunities for improvement, to which the unanswered questions would have been preliminary, we have no justification for assuming that if these questions had been answered subsequent ones would have concerned subjects beyond the pale of legislative inquiry. It would be quite wrong to resolve the appeal against a co-ordinate branch of the government upon the assumption that had these lawful questions been answered, unlawful ones would have followed. If the answers to the general questions are to have any weight, they conclusively establish that, however pertinent or proper the question, the witness would not answer if it concerned his conduct as a member of the election board.
It is said, however, that the non-admissibility of the questions has been established by our decisions in the two HagueCases, In re Hague, 104 N.J. Eq. 369, and In re Hague, 9 N.J.Mis. R. 89; 150 Atl. Rep. 322. I dissent from that view. In the first place, the circumstances out of which those cases arose were wholly different from the circumstances now before us. It is unnecessary to recite all the points of divergence, but it may be noted that in the first of those cases the legislature endeavored to hold Mr. Hague in custody under its own warrant, awaiting arraignment some days later before the legislature in joint session, on a charge of a contempt said to have been committed before a legislative investigating committee; and in the second Mr. Hague refused to answer a series of personal questions which dealt exclusively with his bank accounts, his holdings in cash and the sources from which he obtained the money wherewith to purchase certain properties, upon which refusal the legislature adjudged him in contempt, issued a warrant for his arrest and directed that he be confined in the common jail of the county of Mercer until such time as he should make known to the chairman of the investigating committee, in writing, that he was willing to answer the questions already recited. As against *Page 354 
such a factual and legal status the questions in the instant cases were as has already been detailed and the arrest herein was on a warrant issued by Judge Hartshorne of the Essex common pleas, sitting as a committing magistrate, to answer to a complaint in the Essex quarter sessions. The respondents were bailed to await the action of the Essex grand jury. The offense charged against the respondents as a basis for the issuing of the warrants is clearly stated in the Revised Statutes of 1937,52:13-1 and 52:13-3: "* * * Any standing committee of either house, or any special committee directed by resolution to enter upon any investigation or inquiry, the pursuit of which shall necessitate the attendance of persons * * * shall have power to compel the attendance of such persons as witnesses * * *. Any witness who refuses to answer any questions decided by the committee to be proper and pertinent shall be guilty of a misdemeanor * * *."
The first of the Hague Cases grew out of the acts of a legislative investigating committee appointed under Joint Resolution No. 13. P.L. 1928 p. 808. The resolution authorized the making of a survey inter alia of "all questions of public interest, to investigate violations of law and the conduct of any state official, state department, commission, board or body." This court divided equally upon the question whether the decree below should be affirmed, and the mechanical result of that even division was that the decree below stood as though it had been affirmed or, as the expression is, it was affirmed by a divided court; but that affirmance was in no way an approval of the reasons expressed by the vice-chancellor below. However, while this court divided on the question of affirmance, it was unanimous in holding that the joint resolution, taken as a whole, was a valid exercise of legislative power, even if some one or more of the inquiries authorized therein might be unlawful, that the subpoena was lawfully issued and lawfully required the witness' attendance before the committee notwithstanding the assumed inclusion therein of illegal requirements for the production of documents *Page 355 
and that it was lawful to order a warrant for the arrest of the witness to bring him before the legislature. So we have it that the legislature may, by committee, investigate into matters within its purview and that the inclusion of unlawful inquiries within the stated purpose does not invalidate the resolution if there is inclusion of lawful activities. Among the duties imposed upon the committee by the assembly resolution now under review was "to ascertain whether the duties of such officials, departments, commissions, boards, bodies and of such county boards of election and of such district boards of election have been or are being lawfully and properly discharged, and to report its findings as a basis for such legislative action as the general assembly may deem necessary and proper." As I view it, the obtaining of the information at which that authority was directed is wholly within the legislative province as determined in the cases above cited. Argument contra is sought to be made upon some of the language used in the opinion upon which the second Hague Case was decided. That argument is not well grounded. The decision was made only a year after the first determination. All of the members of the court who voted for it had, with the exception of a justice appointed in the interim, voted in the earlier case in the way I have mentioned. Chief-Justice Gummere, who wrote the opinion in the second case and who, as I have indicated, was one of those who had joined in making the unanimous findings in the first case, obviously saw no inconsistency for he did not undertake to distinguish the former decision — did not so much as mention it — and the syllabi
which preface his opinion state no conflicting doctrine. Certainly the disposition of the first case, made only a year before, must have been distinctly in mind.
So, even if it be that the title of the authorizing resolution in the instant cases anticipates, and that the body of the resolution authorizes, unlawful as well as lawful inquiries, the resolution as a whole is not thereby invalidated. Further, the lawful authorization is separable from those proposed activities which are denounced as unlawful, wherefore, under well *Page 356 
known rules of construction (Hudspeth v. Swayze,85 N.J. Law 592, 609) the good need not go down with that which is said to be bad; and the enacting portion of the resolution is clear of doubt, so that the title or preamble may not be looked to for aid in construction. Hadden v. Collector (Barney), 5 Wall.107; 18 L.Ed. 518; Den v. Urison, 2 N.J. Law [*]212, [*]225;Horner v. Webster, 33 N.J. Law 387; Evernham v. Hulit,45 N.J. Law 53; Pancoast v. Director-General, 95 N.J. Law 428.
The questions which the respondents refused to answer were obviously aimed at ascertaining the functions which the respective members of the election board undertook to perform in the election count. The assembly resolution authorized such an inquiry and was, as I believe, at least to this extent, a lawful exercise of constitutional legislative power. My conclusion is that the decree below should be reversed and the proceedings onhabeas corpus dismissed.
I am authorized to say that Mr. Justice Parker and Judge Wells concur in the foregoing views.
For affirmance — THE CHIEF-JUSTICE, TRENCHARD, BODINE, DONGES, HEHER, PERSKIE, PORTER, HETFIELD, DEAR, WOLFSKEIL, RAFFERTY, WALKER, JJ. 12.
For reversal — PARKER, CASE, WELLS, JJ. 3. *Page 357