[No. 33502.   Department One.   December 15, 1955.]

JOHN S. DRISCOLL, *Plaintiff and Relator*, v. THE CITY OF BREMERTON *et al., Defendants*, BERTIL JOHNSON, *as Judge of the Superior Court for Kitsap County, Respondent.*[1]

[1] Reported in 291 P. (2d) 642.

*James O. Arthur* and *Riddell, Riddell & Williams*, for plaintiff and relator.

*Preston, Thorgrimson & Horowitz* and *Roy A. Holland*, for defendants.

SCHWELLENBACH, J.—The city of Bremerton passed an ordinance authorizing the issuance of bonds in the amount of two hundred thousand dollars, the money to be advanced to the Washington toll bridge authority to pay the costs of engineering, feasibility, and financial plans, reports, surveys, appraisals, estimates, studies, and other items preliminary and necessary for the reconstruction and improvement of the existing approaches and the construction of new approaches to the Manette bridge (which extends across the Port Washington Narrows in the city of Bremerton) and for the construction of a new bridge across the Narrows. It is provided in the ordinance that the city will be reimbursed out of the proceeds of the sale of revenue bonds issued by the authority which will be payable out of tolls imposed for pedestrian and vehicular traffic over the new bridge and the existing bridge as improved. This ordinance was enacted pursuant to chapter 208 of the 1955 session laws, which specifically authorizes the project.

Plaintiff and relator herein, as a taxpayer, sought an injunction to prevent the city from issuing the bonds. A demurrer was sustained to the complaint, and subsequently a judgment of dismissal entered. The matter is before us on a writ of certiorari, the city having agreed not to issue the bonds pending a decision by this court.

The complaint alleged that the ordinance was invalid in that it purported to authorize the reimposition of tolls by

the state of Washington upon the existing Manette bridge, and that such proposed action was prohibited by the act of Congress entitled, "An Act Granting the consent of Congress to W. E. Buell, of Seattle, Washington, to construct a bridge across Port Washington Narrows within the city of Bremerton in the State of Washington." Approved, June 14, 1926. 44 Stat. 744.

The act in its pertinent sections reads:

*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the consent of Congress is hereby granted to W. E. Buell, his heirs, legal representatives, and assigns, to construct, maintain, and operate a bridge and approaches thereto across Port Washington Narrows, at a point suitable to the interests of navigation, within the city of Bremerton, in the State of Washington, in accordance with the provisions of the Act entitled 'An Act to regulate the construction of bridges over navigable waters,' approved March 23, 1906, and subject to the conditions and limitations contained in this Act.

"SEC. 2. After the completion of such bridge, as determined by the Secretary of War, either the State of Washington, any political subdivision thereof within or adjoining which any part of such bridge is located, or any two or more of them jointly, may at any time acquire and take over all right, title, and interest in such bridge and its approaches, and any interests in real property necessary therefor, by purchase or condemnation in accordance with the laws of such State governing the acquisition of private property for public purposes by condemnation. . . .

"SEC. 3. If such bridge shall at any time be taken over or acquired by any municipality or other political subdivision or subdivisions of the State of Washington under the provisions of section 3 [*sic*] of this Act, and if tolls are charged for the use thereof, the rates of toll shall be so adjusted as to provide a fund sufficient to pay for the cost of maintaining, repairing, and operating the bridge and its approaches, and to provide a sinking fund sufficient to amortize the amount paid for such bridge and its approaches as soon as possible under reasonable charges, but within a period of not to exceed fifteen years from the date of acquiring the same. After a sinking fund sufficient to amortize the cost of acquiring the bridge and its approaches shall

have been provided, such bridge shall thereafter be maintained and operated free of tolls, or the rates of tolls shall thereafter be so adjusted as to provide a fund of not to exceed the amount necessary for the proper care, repair, maintenance, and operation of the bridge and its approaches. An accurate record of the amount paid for the bridge and its approaches, the expenditures for operating, repairing, and maintaining the same, and of daily tolls collected shall be kept and shall be available for the information of all persons interested."

Buell constructed the bridge, and it was thereafter taken over by the state of Washington through condemnation proceedings and is now the property of the state. Tolls were imposed for a period of the state's ownership, but that practice has been discontinued for some years.

Our problem is this: Is the state of Washington prohibited by the act from reimposing tolls on the existing Manette bridge?

It will be noted from a reading of the act that § 2 provides for acquisition by purchase or condemnation by either the state of Washington, any political subdivision within or adjoining which any part of the bridge is located, or any two or more of them jointly. On the other hand, § 3, relating to tolls, refers only to "any municipality or other political subdivision or subdivisions of the state of Washington." The act does not, by its terms, prohibit the state from imposing tolls.

It is contended that the act of 1906 entitled, "An Act To regulate the construction of bridges over navigable waters," approved March 23, 1906 (34 Stat. 84), established a "spirit" or "policy" prohibiting the imposition of tolls. The 1906 act merely regulated the construction of bridges over navigable waters. Congress has authorized the construction of hundreds of bridges in accordance with the provisions of that act. Some of the acts mention tolls, others do not. In fact, the vast majority of the acts make no mention of tolls whatsoever. The only reference in the 1906 act to tolls is as follows:

"If tolls shall be charged for the transit over any bridge constructed under the provisions of this act, of engines,

cars, street cars, wagons, carriages, vehicles, animals, foot passengers, or other passengers, such tolls shall be reasonable and just, and the Secretary of War may, at any time, and from time to time, prescribe the reasonable rates of toll for such transit over such bridge, and the rates so prescribed shall be the legal rates and shall be the rates demanded and received for such transit."

We are convinced that the act of 1906 did not establish or inaugurate any "spirit" or "policy" that bridges authorized under it should eventually become toll free, nor has such a policy been evidenced by subsequent acts of Congress. The sole expression of policy in the 1906 act with reference to tolls is that, if they are to be charged, they must be reasonable.

It is also contended that, inasmuch as § 2 of the act under consideration provides for the acquisition of the bridge by the state, any political subdivision within or adjoining which any part of the bridge is located, or any two or more of them jointly, it was the intention of Congress, with respect to tolls, to limit any or all of those authorized to so acquire it, including the state.

One answer to that contention is that the act does not so state. In interpreting a statute, the legislative intent must be determined primarily from the language of the statute itself. 50 Am. Jur. 210, Statutes, § 227. It is also advisable at times to consider statutes *in pari materia*. 2 Sutherland Statutory Construction 535, In Pari Materia and Adopted Statutes, § 5202.

Chapter 358, Sixty-Eighth Congress, Sess. I (43 Stat. 660) was an act approved June 7, 1924, authorizing the counties of Kittitas and Grant, in the state of Washington, to construct a bridge at Vantage Ferry. Section 2 provided:

"The State of Washington, or any political subdivision or subdivisions thereof, within or adjoining which said bridge is located, may at any time acquire all right, title, and interest in said bridge and the approaches thereto constructed under the authority of this Act, for the purpose of maintaining and operating such bridge as a free bridge, by the payment to the owners of the reasonable value thereof, not to exceed in any event the construction cost thereof:

*Provided,* That the said State or political subdivision may operate such bridge as a toll bridge not to exceed five years from date of acquisition thereof."

It is to be noted that the *state,* or any political subdivision or subdivisions, might acquire the bridge for the purpose of maintaining it as a free bridge, provided that the *state* or political subdivision might operate it as a toll bridge for five years.

Chapter 366, Sixty-Eighth Congress, Sess. II (43 Stat. 1052), approved February 28, 1925, authorized W. D. Comer and Wesley Vandercook to construct a bridge across the Columbia River between the cities of Longview, Washington and Rainier, Oregon. The act authorized the states of Washington and Oregon, or either of them, or any political subdivision or subdivisions thereof, to acquire the bridge for the purpose of operating it toll free, but permitted the state or states or political subdivision or subdivisions to collect tolls for five years.

Chapter 453, Sixty-Eighth Congress, Sess. II (43 Stat. 1131), approved March 3, 1925, authorized R. L. Gaster to construct a bridge across the White River in the state of Arkansas. It also authorized the state of Arkansas, or any political subdivision or divisions thereof, to acquire and operate the bridge under the same terms as provided for the acquisition and operation of the Vantage and Longview bridges.

Chapter 62, Sixty-Ninth Congress, Sess. I (44 Stat. 213) approved March 18, 1926, authorized the Midland and Atlantic Bridge Corporation to construct a bridge across the Big Sandy River between the states of Kentucky and West Virginia, and to collect tolls. It also authorized the states of West Virginia and Kentucky, or any official agency of either thereof, or any political or other subdivision or subdivisions thereof within or adjoining the bridge, to jointly or severally acquire the bridge, but there was no mention in the act concerning the imposition of tolls by them.

Chapter 446, Sixty-Ninth Congress, Sess. I (44 Stat. 682), adopted June 2, 1926, authorized Fred H. Furey to con-

struct a bridge across the Columbia River near the mouth of the Entiat River in Chelan county, Washington. It provided that "either the State of Washington, any political subdivision thereof within or adjoining which any part of such bridge is located, or any two or more of them jointly," may acquire the bridge. It also provided limitations upon the imposition of tolls if the bridge should be taken over or acquired "by any municipality or other political subdivision or subdivisions of the State of Washington." The language of the act is identical, with the exceptions of names and location, with the language authorizing the construction of the Manette bridge.

Then, on the same day, June 2, 1926, Congress enacted Chapter 447 (44 Stat. 683) authorizing the Red River Parish Bridge Company (Incorporated) to construct a bridge across the Red River, in the state of Louisiana. Its provisions as to acquisition and charging of tolls are identical in language with the act authorizing the construction of the Manette bridge.

An examination of many acts authorizing the construction of bridges over navigable waters reveals that Congress has established no set pattern with reference to the imposition of tolls. Each problem is disposed of according to the particular situation then confronting it. Some acts provide for tolls while others are silent on the subject. Some acts permit states and their political subdivisions to acquire bridges and prohibit the states and their political subdivisions from imposing tolls after a certain period of time. Other acts permit states and their political subdivisions to acquire bridges and limit the political subdivisions as to the imposition of tolls, but place no limitation in that regard on the states. The latter plan was followed in connection with the authorization for the construction of the Manette bridge.

Relator also contends that, as § 2 of the act under consideration provides for the acquisition by the state, any political subdivision, "or any two or more of them jointly," the state and any political subdivision may jointly acquire

the bridge, and that it must have been within the contemplation of Congress to include the state with its subdivisions when reference to tolls was made in § 3, but that mention of the state was unintentionally omitted. What we have heretofore stated disposes of that contention. Furthermore, it is clear that the phrase in § 2, "or any two or more of them jointly" refers to acquisition by two or more political subdivisions of the state.

When we analyze the act under consideration, in the light of other acts authorizing the construction of bridges over navigable waters, it becomes apparent that it is clear and unambiguous in its terms. Therefore our guide in arriving at the intention of Congress is the language used by that body. *United States v. Wiltberger,* 5 Wheat. [18 U. S.] 76, 5 L. Ed. 37; *Smith v. Stevens,* 10 Wall. [77 U. S.] 321, 19 L. Ed. 933; See 59 F. D. 440, Key No. 181 (1); 2 Sutherland Statutory Construction 334, The Rule of Literalness, § 4702.

In *Hadden v. Barney,* 5 Wall. [72 U. S.] 107, 18 L. Ed. 518, the court confined itself to the words used in the act then under consideration, and as to the alleged "policy" of Congress with respect to the act said:

"What is termed the policy of the government with reference to any particular legislation is generally a very uncertain thing, upon which all sorts of opinions, each variant from the other, may be formed by different persons. It is a ground much too unstable upon which to rest the judgment of the court in the interpretation of statutes."

In *United States v. Union Pac. R. Co.,* 91 U. S. 72, 23 L. Ed. 224, the court said: "The act itself speaks the will of Congress, and this is to be ascertained from the language used."

To accept relator's argument would necessitate the addition of the state of Washington into the terms of the restrictive provisions of § 3. While the logic of providing that either the state or a political subdivision thereof may acquire full title to the bridge, and on the other hand that the political subdivisions of the state, but not the state itself, are to be limited with reference to the imposition of

tolls on the bridge, may appear to be questionable, we, as the judicial branch of the government, cannot supply omissions in legislation. *United States v. Union Pac. R. Co., supra.*

As was said in *Department of Labor & Industries v. Cook,* 44 Wn. (2d) 671, 269 P. (2d) 962:

"But, whether the seeming lack of logic in this situation is the product of inadvertence or intention, the fact remains that the act lacks such a provision. The court cannot read into a statute anything which it may conceive that the legislature has unintentionally left out."

See, also, *McKay v. Department of Labor & Industries,* 180 Wash. 191, 39 P. (2d) 997, 98 A. L. R. 990; *Maryland Cas. Co. v. Tacoma,* 199 Wash. 384, 92 P. (2d) 203.

The act authorizing the construction of the Manette bridge placed no restrictions on the state of Washington with respect to the imposition of tolls. The trial court did not err in sustaining the demurrer to the plaintiff's complaint and in dismissing the action upon failure to plead further.

The judgment is affirmed.

HAMLEY, C. J., MALLERY, FINLEY, and OTT, JJ., concur.